UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
JAMES LIDESTRI,                                        **SECOND AMENDED COMPLAINT**

                Plaintiff,              **Case No. 25-cv-1166**

     - against -                          **ECF Case**

AUDREY BURNS,

                Defendant.
---------------------------------------------------------- X

     Plaintiff, JAMES LIDESTRI, by and through his attorneys, BRILL LEGAL GROUP, P.C., complains of the defendant as follows:

## PRELIMINARY STATEMENT

     1.    This defamation, libel and slander action is brought in response to the malicious campaign of public lies Audrey Burns ("Ms. Burns") engaged in through a series of conversations with reporters for the *New York Times* ("*the Times*"), which ultimately led to Ms. Burns knowingly and intentionally causing and allowing these vicious lies about James Lidestri ("Mr. Lidestri") to be published in *the Times* in a devastating investigative journalism article that was published across *the Times'* multiple print and internet platforms and widely promoted to its users and viewers alike.

     2.    In sum and substance, Ms. Burns falsely claimed that when she was a child, ~~James~~ Mr. Lidestri ~~drugged her, raped~~ sexually assaulted her and paid her off, knowing that what she was saying was completely and totally false, and with the full intention of destroying his good name.

3.      Mr. Lidestri brings this action to hold Ms. Burns accountable for making the vicious false statement to millions of people that he ~~drugged her, raped~~ sexually assaulted her~~,~~ and paid her off when she was a child.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff is an individual citizen of the State of New York, as he is both domiciled in Dutchess County in the State of New York within the meaning of 28 U.S.C. § 1332 and has demonstrated through his actions that he intends to remain in the State of New York.

5.      Defendant is an individual citizen of the State of Oklahoma, as she is both domiciled in the City of Moore, State of Oklahoma within the meaning of 28 U.S.C. § 1332 and has demonstrated through her actions that she intends to remain in the State of Oklahoma. At all times relevant to the allegations in this complaint, Defendant derived a substantial portion of her income via interstate commerce as a model on *OnlyFans.com*, a website owned by Fenix International Limited, which is based in the United Kingdom.

6.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7.      Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial district and a substantial portion of the events giving rise to the claims asserted in this action occurred in this judicial district.

## JURY DEMAND

8.      Plaintiff demands a trial by jury in this action on each and every one of his claims.

**STATEMENT OF FACTS**

9. Mr. Lidestri is a moderately successful businessman and consultant who has been engaged in a number of technology and media ventures throughout his career.

10. Only one of the companies he has worked for in a senior capacity has been publicly traded; he left that company nearly 25 years ago.

11. As part of his work, the businesses Mr. Lidestri works for issue press releases to attract investments and business partners. This is common throughout the private sector, with hundreds of thousands of press releases issued per year.

12. Mr. Lidestri's Linkedin profile has slightly more than 1,000 connections whereas, for example, Mark Cuban[1] has 8,028,622 followers and Alina Habba[2] has 12,157.

13. Mr. Lidestri does not make media appearances and is not sought after for comment on any industry topics for publication.

14. No trade show organizers or technology conferences have Mr. Lidestri to speak at their events because of his knowledge, experience or position in any industry.

15. Mr. Lidestri is not well known in the technology sector, or any other sector, and he has made no effort to increase his profile.

16. Other than through this litigation and the incidental mention of his name in two articles in the *New York Times*, he is not known in connection with any particular cause or controversy, and he has not invited further public scrutiny or attention.

17. Beginning in approximately 2001, as a side gig, Mr. Lidestri became involved in the glamour photography business, initially shooting nude photographs of adult female models and building websites for some of those models so that they could monetize their photos and

---

[1] https://www.linkedin.com/in/mark-cuban-06a0755b/, visited May 18, 2025.
[2] https://www.linkedin.com/in/alina-habba-esq-836126b/, visited May 18, 2025.

videos.

18. These websites were called subscription sites, whereby a viewer would pay a fee by credit card to access the photo and video content contained within.

19. Mr. Lidestri was involved in photo shoots for around forty models over approximately four years in that business without a single complaint about his behavior.

20. Mr. Lidestri established a corporation for this business venture, which was the same corporation he used throughout his photography and website business, including during all of the interactions with the Defendant, Ms. Burns.

21. That corporation was registered to a business address in Dutchess County, State of New York.

22. That corporation did all of its business banking with a Wells Fargo bank in Dutchess County in the State of New York, and all payments made to Defendant, among others, whether by cash or check, or any other form of payment, were made through that bank.

23. In approximately 2008, Mr. Lidestri was contacted by the mother of a model who was under the age of 18 who also wanted him to conduct photoshoots and build a website for her daughter.

24. The mother and model were living in Florida and said they had acquaintances who would also be interested in a similar arrangement.

25. Mr. Lidestri agreed to do the photoshoots and have his company build the websites for the initial model and any interested acquaintances, but only under certain conditions, which were included in a contract that the model, the model's parent or guardian (if the model was under 18) and Mr. Lidestri would sign before any photos were taken:

    a. All financial compensation arrangements would be placed clearly in writing;

    b. A release authorizing the company to host the pictures on the website would be executed;

    c. For models under the age of 18, a parent or guardian would need to be present at the photoshoot at all times;

    d. The poses and attire would need to be agreed to by the guardian (if the model was under 18) prior to the photoshoot; and

    e. All laws regarding the photography of a minor would be adhered to.

  26. All of the company websites were hosted on servers in the United States and used credit card processors based in the United States. They were not accessible via the "dark web" or hidden from the public—every site the company built was accessible to anyone 18 or older who held a valid credit card.

  27. Each model and parent were given login credentials to access the subscription websites so that they could see the entire collection of photos and videos of every model.

  28. The website had a comment moderation feature built into the site so that the models would be shielded from inappropriate or hostile user comments. Comments from subscribers to the models were moderated first by someone on the company's staff and in the cases in which the subscriber made an inappropriate comment, the company would delete the comment and issue a warning, and in the more egregious situations the subscribers were banned from the site.

  29. The models would never receive communications from users on their personal devices--all comments between subscribers and the models were done on the website, with no personal contact information shared.

  30. During the entire duration of this venture, no parent, model or any other party

ever lodged a complaint about any aspect of this business other than Defendant.

**Introduction to Ms. Burns**

31. Prior to his introduction to Ms. Burns, the website had been operating for approximately three years, with at least 20 models on the site at that time.

32. The vast majority of models on the site were between 16 and 21 years old, but a few were 15 years old.

33. There was no requirement that a model be 16 years old in order for photos to be posted on the site.

34. Mr. Lidestri became acquainted with Ms. Burns when she was 16 years old in late 2012 or early 2013 through a Dallas-based photographer who had previously photographed her. Mr. Lidestri had no contact with Ms. Burns prior to the age of 16.

35. Ms. Burns and her mother expressed interest in being added to Mr. Lidestri's company's website, so the Dallas photographer, Ms. Burns and her mother agreed to license some photos to put on the company's website to introduce Ms. Burns to the website members.

36. The first payment to Ms. Burns was when Mr. Lidestri's company purchased three sets of photos which appeared on the website when Ms. Burns was over 16 years old.

37. At around that same time, Ms. Burns and her mother made plans to have her first photoshoot with Mr. Lidestri in New York, since she was living in Oklahoma and had never been to New York.

38. Mr. Lidestri adhered to the rules outlined above and never asked Ms. Burns to come to New York on her own.

**First Photoshoot with Ms. Burns – April 2013**

39. The first photoshoot with Ms. Burns was on April 19 and 20, 2013, within one month after releasing the three sets of photos taken by her photographer, when Ms. Burns was 16 years old.

40. Ms. Burns and her mother flew into New York City on Thursday, April 18, 2013 and Mr. Lidestri transported them to his home studio in Dutchess County.

41. Prior to starting the photoshoot, while in the Dutchess County studio, Ms. Burns and her mother signed the contract and approved of all the attire to be worn throughout the day, as required.

42. Ms. Burns' mother was present for both days and was free to be in the studio whenever she wanted to while the photoshoot was being conducted.

43. No alcohol or drugs of any kind were provided to Ms. Burns or her mother.

44. There was no inappropriate physical contact between Mr. Lidestri and Ms. Burns at any time, at the photo shoot or on any other date.

45. Mr. Lidestri never touched the intimate parts of Ms. Burns' body with his hands, at the photo shoot or on any other date.

46. Mr. Lidestri never touched the intimate parts of Ms. Burns' body with his mouth, at the photo shoot or on any other date.

47. Indeed, no intimate part of Mr. Lidestri's body ever came into contact with any intimate part of Ms. Burns' body at the photo shoot or on any other date.

48. Mr. Lidestri never sexually assaulted Ms. Burns, at the photo shoot or on any other date.

49. The photoshoot went very well and Ms. Burns and her mother were both

extremely happy, and they both exclaimed that they couldn't wait to do another photoshoot.

50. On Sunday, April 21, Mr. Lidestri drove them both to Manhattan and gave them a tour.

51. Ms. Burns was especially interested in seeing Times Square and in doing some shopping, so Mr. Lidestri accommodated them at the company's expense, paying for everything, including at the Juicy Couture store so she could buy some personal clothing.

52. Mr. Lidestri reserved a hotel room for Sunday night at the Crowne Plaza Times Square Manhattan for Ms. Burns and her mother, so that they could get to the airport and return home on Monday while Mr. Lidestri returned home Sunday night.

53. Mr. Lidestri flew to California the next morning.

**Second Photoshoot with Ms. Burns**

54. Ms. Burns and her mother were so happy with the first photoshoot that they enthusiastically invited Mr. Lidestri to their home area in Oklahoma to conduct a second photoshoot within weeks of the first one.

55. They suggested the Choctaw Casino and Resort Hotel as the venue, and it was scheduled for Sunday, June 2, 2013.

56. The shoot was very successful and both Ms. Burns and her mother were very happy with the results.

57. So as to avoid confusion, here as well, no alcohol or drugs of any kind were provided to Ms. Burns or her mother.

58. There was no inappropriate physical contact between Mr. Lidestri and Ms. Burns at any time, at the photo shoot or on any other date.

59. Mr. Lidestri never touched the intimate parts of Ms. Burns' body with his hands, at the photo shoot or on any other date.

60. No intimate part of Mr. Lidestri's body ever came into contact with any intimate part of Ms. Burns' body at the photo shoot or on any other date.

61. Mr. Lidestri never touched the intimate parts of Ms. Burns' body with his mouth, at that photo shoot or on any other date.

62. Mr. Lidestri never sexually assaulted Ms. Burns, at that photo shoot or on any other date.

63. Additional photoshoots followed thereafter.

**Final Photoshoot with Ms. Burns**

64. The final photoshoot with Ms. Burns was in July 2014, shortly after she turned 18.

65. At that photoshoot, Amanda Zimmerman was going to be a second model to be photographed at the same location.

66. Ms. Zimmerman and Ms. Burns arrived very late to the shoot, keeping two photographers and a makeup artist waiting.

67. Mr. Lidestri later found out that they had gone out drinking the night before and were hung over.

68. During that shoot, Ms. Zimmerman told Mr. Lidestri that she wanted to take some pictures with Ms. Burns, which they did at the end of the photoshoot. Mr. Lidestri and his staff gave them copies of the photos.

69. The photos were not nude and were only taken at Ms. Zimmerman's request, for personal reasons not relevant to this action.

**Ongoing Business Relationship with Ms. Burns**

70. Mr. Lidestri's company continued to publish Ms. Burns' photos and videos on its website for years after the photoshoots.

71. Mr. Lidestri's company continued to pay Ms. Burns her portion of the profits as per her contract after the photoshoots as well.

72. Each of those transactions originated in New York State, and were paid through the same Wells Fargo Bank in Dutchess County.

**The New York Times Investigation and Article**

73. ~~9.~~ Between December ~~15~~24, 2024 and December 28, 2024, two reporters from *the Times*, Jennifer Valentino-DeVries and Michael H. Keller, contacted Mr. Lidestri and his attorneys to discuss allegations made by Ms. Burns that were to be part of a forthcoming article.

74. Mr. Lidestri was not even going to be the focus of that article; it was instead focused on men who use Instagram to develop grooming relationships with child models.

75. ~~10.~~ As part of that article, however, the reporters spoke with earlier online models, one of whom was Ms. Burns, who had suffered from years of emotional and mental issues and substance abuse.

76. The reporters then contacted Mr. Lidestri for a response to Ms. Burns' false allegations.

~~11~~77. In the December 30, 2024, article, Ms. Burns was depicted in the article in the photo and caption below:

10



Audrey Burns said she was sexually assaulted as a minor after she traveled for a photo shoot. Desiree Rios for The New York Times

~~12~~78.   Mr. Lidestri and his attorneys had multiple conversations with *the Times* reporters in the five days leading up to the publication of the Lidestri article. The reporters revealed that Ms. Burns had met and/or spoken with *the Times* reporters about her interactions with Mr. Lidestri. Among Ms. Burns' statements to *the Times* reporters were the following:

    a.   Ms. Burns said that when she was 16 years old, she traveled to New York with her mother and they went to Mr. Lidestri's house for a photo shoot.

    b.   That Ms. Burns was alone in Mr. Lidestri's house with him, without her mother present.

    c.   While there, Mr. Lidestri gave her a drink which left her feeling strange, after which he sexually assaulted her with his hands and mouth.

    d.   He then provided her more money than what had previously been arranged for the photo shoot.

    e.   Ms. Burns allegedly provided a photo to the reporters purportedly showing at least $1,000 in cash from that trip as alleged proof of her story.

    f.   She allegedly posted photos of her trip to Facebook.

~~13~~79.   The portion of Ms. Burns' statements that ~~was~~ were published in *the Times* article (the "Lidestri Article") ~~was~~ were as follows:

> ***Another woman, Audrey Burns, now 28, said Mr. Lidestri sexually assaulted her when she visited him in New York for a photo shoot.*** At the time, she said, her life was chaotic, and she had lived for a while with her mother in a shelter in Oklahoma.
>
> She started working for Mr. Lidestri when she was 14, she recalled, and later traveled to New York with her mother. Photos she shared on Facebook from the trip included separate images of Mr. Lidestri and at least 10 $100 bills. They were posted in April 2013, when she was 16.

> *Mr. Lidestri offered her money beyond what she had been paid for the photo shoot, Ms. Burns said. He then sexually assaulted her with his hands and mouth, she said. "He asked if I wanted to stop, and I couldn't speak," she said. "I was catatonic."*
>
> ……………….
>
> All three women said they remained quiet when younger because they felt powerless, because they needed the money or because Mr. Lidestri said they or their parents could get in trouble.
>
> [*Emphasis added*.]

~~14~~80. In sum and substance, Ms. Burns falsely claimed to the world, using the megaphone of *the New York Times*, that when she was a child, James Lidestri ~~drugged her, raped~~sexually assaulted her and paid her off, knowing that what she was saying was completely and totally false, and with the full intention of destroying his good name.

81. Mr. Lidestri did none of these things. He did not drug Ms. Burns, nor did he sexually assault her in any way.

~~15~~82.  On December 30, 2024, on her public Facebook profile, which was accessible to anyone who chose to visit it[3], Ms. Burns posted the below post, further amplifying *the Times* story and her lies contained therein:



---

[3] https://www.facebook.com/profile.php?id=61567917177972, visited February 1, 2025.

83. This post, which amplified the reach of Ms. Burns' libelous statements in *the Times* article, received six comments at the time this complaint was initially drafted, and an unknown number since.

84. The Facebook post was seen an unknown number of times by Facebook ~~users, and~~ users and led to an unknown additional amount of visits to *the Times* article and Ms. Burns' libelous statements therein.

~~16. Not only were Ms. Burns' statements false, but they beggared belief. If, as Ms. Burns claimed, her mother accompanied her to New York, didn't she stay for the photo shoot itself? If not, where had she gone during the shoot? And why would her mother accompany her daughter all the way to New York and then abandon her daughter to be alone with a grown man for a photo shoot? How was it even possible if they didn't have transportation of their own? Even if it had been possible, when her mother returned to the house after the photo shoot, how would she have she failed to immediately notice her own daughter under the influence of alcohol and/or drugs and in a "catatonic" state? How could they go back to their hotel, travel all the way back to the airport, wait at the airport for their flight, then travel all the way home to another state with nothing discussed between the two as to what Ms. Burns now alleges happened, let alone for *decades* after? And why did Ms. Burns eagerly continue to work with Mr. Lidestri for two more years after this supposedly traumatic event? Despite the complete ludicrousness of this tale, *the Times* published it anyway, accepting fantastical claims from a source with ulterior motives.~~

## FIRST CLAIM FOR RELIEF
### (Defamation)

~~17~~85. Plaintiff re-alleges and incorporates paragraphs 1 through 15.

~~18~~86. Ms. Burns published or caused to be published false and defamatory statements in *the Times*, which did and had the tendency to expose Mr. Lidestri to hatred, contempt, ridicule and/or disgrace.

~~19~~87. The defamatory statements in the Lidestri Article are of and concerning Mr. Lidestri, and reasonably understood to be about Mr. Lidestri.

~~20~~88. The defamatory statements in the Lidestri Article are false.

~~21~~89. Ms. Burns caused the defamatory statements in the Lidestri Article to be published knowing that they are false or with reckless disregard for the truth of the statements.

~~22~~90. The defamatory statements in the Lidestri Article constitute defamation *per se* because they tended to injure Mr. Lidestri in his trade, business or profession and directly implicated Mr. Lidestri in a horrific crime; specifically, that he ~~drugged and raped~~sexually assaulted a child and then paid her off.

~~23~~91. In light of Mr. Lidestri's standing in the community, the nature of the statements made about him, the extent to which those statements were circulated, and the tendency of such statements to injure someone such as Mr. Lidestri, the defamatory statements in the Lidestri Article have directly and proximately caused Mr. Lidestri to suffer significant damages, including damage to his reputation, humiliation, embarrassment, mental suffering, shame and emotional distress.

~~24~~92. These damages are ongoing in nature and will continue to be suffered in the future.

~~25~~93.  The re-publication of the defamatory statements in the Lidestri Article in other publications, as well as via the dissemination of the Lidestri Article through social media, including through Ms. Burns' own Facebook page, caused Mr. Lidestri to suffer additional damages, all of which were foreseeable to Ms. Burns.

~~26~~94.  Ms. Burns' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Mr. Lidestri, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Mr. Lidestri to an award of punitive damages.

~~27~~95.  As a direct and proximate result of Ms. Burns' misconduct, Mr. Lidestri is entitled to compensatory, special and punitive damages in an amount to be proven at trial far in excess of $75,000.00.

## SECOND CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress

~~28~~96.  Plaintiff re-alleges and incorporates paragraphs 1 through 26.

~~29~~97.  Ms. Burns' conduct was careless and negligent as to Mr. Lidestri's emotional health of and caused him severe emotional distress.

~~30~~98.  Ms. Burns' conduct was the direct and proximate cause of injury and damage to Mr. Lidestri and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

~~31~~99.  As a result of the foregoing, Mr. Lidestri was subjected to significant emotional pain and suffering, and was otherwise damaged and injured.

~~32~~100. As a result of the foregoing, Mr. Lidestri suffered significant damages in an exact amount to be determined at trial but in no event less than Two Hundred Fifty Thousand ($250,000.00) Dollars as to Ms. Burns.

### THIRD CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

~~33~~101. Plaintiff re-alleges and incorporates paragraphs 1 through 31.

~~34~~102. ~~———~~Ms. Burns' conduct was extreme, outrageous, and utterly intolerable in a civilized community; conduct which exceeded all reasonable bounds of decency.

~~35~~103. Ms. Burns' conduct was intended to and did cause severe emotional distress to Mr. Lidestri.

~~36~~104. Ms. Burns' conduct was the direct and proximate cause of injury and damage to Mr. Lidestri and violated his statutory and common law rights as guaranteed by the laws of the Constitution of the State of New York.

~~37~~105. ~~———~~As a result of the foregoing, Mr. Lidestri was subjected to emotional pain and suffering, and was otherwise damaged and injured.

~~38~~106. Ms. Burns' conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Mr. Lidestri, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Mr. Lidestri to an award of punitive damages.

~~39~~9107.~~———~~As a direct and proximate result of Ms. Burns' misconduct, Mr. Lidestri is entitled
 to compensatory, special and punitive damages in an amount to be proven at trial far in excess of Two Hundred Fifty Thousand ($250,000.00) Dollars.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, James Lidestri, demands judgment against Defendant, Audrey Burns, as follows:

i. An award of compensatory, special and punitive damages in amounts to be established at trial as to the claim of defamation in excess of $75,000;

ii. An award of compensatory damages in an amount to be established at trial as to the claim of negligent infliction of emotional distress in excess of $250,000;

iii. An award of compensatory, special and punitive damages in amounts to be established at trial as to the claim of defamation in excess of $250,000.

iv An award of Plaintiff's costs associated with this action, including but not limited to her reasonable attorneys' fees and expenses; and

v. Such other and further relief as the Court deems just and proper to protect Plaintiff's rights and interests.

Dated: ~~March 25~~May 19, 2025
New York, New York

**BRILL LEGAL GROUP, P.C.**
*ATTORNEYS FOR PLAINTIFF*

By: /s/ Peter E. Brill
Peter E. Brill (PB0818)
176 Lexington Avenue
Suite O
New York, NY 10016
(212) 233-4141
pbrill@brill-legal.com

19